Hello, good morning. My name is Corrine Kudrick. I'm an Inspector from the Prison Law Office. We're presenting with Ron Oyenik, and I'd like to reserve one minute for rebuttal. Ron Oyenik is a prisoner with prostate cancer who is wholly dependent upon the state of Arizona's private contractor, Corizon Health, for his medical care. The record shows that for almost one year, on more than a dozen occasions, Corizon ignored, denied, or delayed requests for diagnostic tests and treatment for his cancer. While he waited, he suffered severe pain that impacted his ability to perform activities, including such as walking, singing, and urinating. The district court correctly found that there were sufficient facts such that a jury could find that his cancer was a serious medical need and that the delays caused him serious harm, that Corizon's corporate stature and bureaucracy was the cause of the delays, and that these delays and denials could amount to deliberate indifference. But then, after finding harm, causation, and deliberate indifference, the case didn't go to a jury. Instead, the district court erred and granted summary judgment to Corizon on the basis that Mr. Oyenik did not meet the Monell standard for municipal liability. This court must reverse for three reasons. First of all, and most fundamentally, Supreme Court Will and this court, McCransky, made clear that Monell does not apply to a state agency. So it makes no sense that the district court would then apply Monell to a state's contractor when Monell doesn't apply to the state itself. Second, if Corizon's bureaucratic structure caused the harm that amounted to deliberate indifference, then the corporate entity is responsible for its bureaucratic structure, and Monell is irrelevant to any analysis of liability. And finally, even if Monell somehow extends to a state agency's private contractor, Mr. Oyenik has nevertheless met the Monell standard and proved sufficient facts to hold the corporation responsible. All right. So let's just break this down a little bit in there. So one of your arguments is that Monell should be limited to local governments and not states. Is that right? So the exact same thing. So I'm just trying to figure out the exact same conduct would be that a local government would be subjected to vicarious liability but not the state. Is that what happened? No. What we're saying is that the Monell protection against liability clearly applies to municipalities, but Supreme Court has made clear in Will v. Michigan Department of State Police that states are protected by the 11th Amendment while municipalities are not, and therefore they limited their holding to Monell to local government units. And then this court, in the case of Kramsky v. Nevada, cited Will and said, quote, The Supreme Court has expressly declined to extend Monell's theory of municipal liability under Section 1983 to state entities. So what we're saying is if Monell does not apply to a state entity or state or its agencies, then why would Monell apply to the state's contractor? Well, the underlying theory, of course, is that states have limited immunity where the private contractor would not, arguably. Right. Right. Well, that's under the Del Campo case, of course. But, again, I think then you'd look into the fact that the state actor doctrine and the contours of liability are never quite the same when it's a government defendant versus a private defendant. And so, you know, besides the Del Campo example, there's other examples in terms of qualified immunity. The Richardson and Wyatt cases that said that the private contractor's employees do not get the same qualified immunity that government employees get. There's also been the cases that said that the limits on punitive damages for municipalities don't apply to private contractors. So there's no reason that just because Chrysler is working as a state actor that somehow you have to force them into the odds of being some, of analogizing them to some type of government entity. So I guess I'm going to just try to answer this. So the same company doing this and the same exact public function would be subjected to vicarious liability simply because of whom it chose to contract with? Correct? Does that seem arbitrary? It doesn't seem arbitrary. I think that when you look at the scope of the liability that exists in terms of the distinction between the states and between the municipalities, there's different systems of liability that go along. And, you know, I think especially in the context of the privatization that is happening with a lot of government functions, the courts are struggling with trying to figure out what box do you put a corporation in? Do we analogize it to a state? Do we analogize it to a municipality? Some decisions have treated these corporate entities as if they were an employee of a government. And so what we're seeing here is instead of trying to cram them into a box that they don't fit, treat them as what they are. They're a corporation. And so, therefore, they should be treated as a corporation and, therefore, so it's not about which protection they need that extends to the government. I think in that case, then you start getting into the policy arguments that were underlying the Shields decision and those that we put out in terms of the different motivations for the corporations versus the state actors and responding to different sorts of outside influences. Can we go over the best argument I would like to hear that you have for why the courts all deem it unconstitutional or coerce them to deem it an unconstitutional practice or unconstitutional policy? Right, because the fact is I understand that what the district court judges decided, it was one individual. So if it's not a practice, then your argument for a practice is that there were multiple incidents. Is that correct? Right, right. So if you're looking at it in the Manow test in terms of number and what becomes a custom, there's no magic number that's set out. The facts that were recited by the district court below showed that there was close to or more than a dozen separate incidents. And the district court, in its opinion, seemed to imply that somehow Mr. Oinek needed to present evidence of other prisoners who had suffered similar treatment at the hands of Verizon, and that is completely problematic for several reasons. First is just simply practical. He's a Bruce A. prisoner, and under Arizona State law, he has no right to look at or possess any other inmate's medical or master file. So he would not be able to gather that information. He's barred from it. He's also barred from accessing other individuals' medical records under federal law. So, you know, making that sort of requirement would just create basically an absolute bar. Also, you know, the policy, yeah, I think you were also arguing that because they had to go through the three triumphant sort of decision-making and that was not constitutional policy. That's how I understood your argument. Is that correct? Well, yeah, and the district court found that this policy was the cause. The bureaucratic structure itself can be a policy, and that's something in the Seventh Circuit listing case that we filed that was just recently decided. Similarly, they found that Verizon's bureaucratic structure could be a policy in and of itself. But so is your argument, and I'm actually going to sort of drift you around this new Seventh Circuit case that you identified, is that a bad policy equals no policy? I mean, because I think you're going to say it's policy, even if there was some issues with it, there was a policy. So the listing case from the Seventh Circuit talked about the fact that in that situation Verizon had created a bureaucratic structure where there was no one person that was responsible for the inmates' care, and the act of creating such a bureaucratic structure was in and of itself a policy. I see I only have 45 seconds. Good morning. Your Honor, this is Richard Goldberg. I'm here at the Buckingham House. I kind of want to introduce some people for the anthology, Verizon Health. First, I'd like to follow up on Judge McGee's question. Put simply, Mr. O'Hanlon's position is that Verizon had a policy of delay. The Verizon policy did not require, did not sanction delay. The Verizon policy did not require, did not sanction deliberate indifference. Mr. O'Hanlon, there is a fundamental distinction under Monell, and it is a distinction with a substantive difference. It is the difference between policymaking and decisionmaking. In this case, the policy was the procedure. The policy was neutral on its face. The consideration of a consultation request at the third and final stage was made by medical providers. Those medical providers made a medical decision, an independent decision. They were not merely putting out a statement. That's good, because you don't have much time, and I have some questions. It did seem very bureaucratic to the point where it did cause a lot of delay. Do you acknowledge that it caused delay? I think we've admitted there was some delay, but the point is the delay was not due to the policy. Well, the policy was for whenever somebody wanted to request the local doctor, would then send it up the chain. Was you going to go to a board of three doctors? It seems like it. I'm not really sure. Even after looking at all the documentation, what the policy is, we haven't seen the routing of the request, but it was mired in a lot of bureaucracy because then the three people sometimes didn't get the request or if they got the request and they sent it back. There was further additional delay because of all of the levels that it had to go through. It went to a three-stage process. The decisions were made by the medical providers. They implemented the policy. They carried it out. There's no accounting for time. Didn't you hear back from some of those who got lost into a black hole? Well, under the record before us, I mean, that is before the district court. This was the policy, this review procedure. I don't believe there is liability for Carice here under Bunnell because there was no longstanding practice or custom. The cases require that the custom or practice be widespread, persistent, and longstanding. The Supreme Court, in the Ropanik decision, indicated that in that case, the employee who had been suspended and retaliated against for objecting to a policy that was taken outside court, he was the policy only applied to him, and the Supreme Court said you've only shown your policy applies to you, and that was also the ruling in Gann by this circuit only three years ago. Was there any special, through our call for expediting urgent requests, for critical medical procedures or treatments? There is not, under the record, before the district court. And so can you explain for me the delay that occurred here? I think you can. Can I just say the substantial delay that occurred here? With bringing in a case and indicting all Carice responsible for the delays, the first request that would have gotten to the third level was in June of 2013, and there was some delay before he got his biopsy. But once he got it, there was a determination. He was sent, and that would have been made, a decision made by the highest level. He was sent to urologist. He was sent to oncologist. So you're saying a policy where it takes a year for someone to be seeking advice and treatment from a doctor regarding definite ailments, everything that occurred in between there is no problem with that policy because he did not get finally diagnosed and get treatment for almost 12 months later. You're standing there saying that that's okay. I'm not saying that's okay. Talk to me about the policy. What I'm saying is that the first request that would have come to the third level was in June. He was trying to receive his biopsy in September, and then a week later he was diagnosed. Well, that means he first went to the doctor not in June. He went to the first doctor in March. That didn't get to the chrysanthemum level until at least June. So that was that. There's no evidence in the record why that request was not made beforehand. But once he was diagnosed, he was sent to specialists, and those individuals required scans, and it took some time while the specialist didn't indicate the chrysanthemum he needed. There were some sporadic instances of delay, but his court assumed it. I'm just not getting past this. He has shown that he had at least a dozen instances, which you just referred to, of delay or denial of the diagnostics or therapeutic treatments for his prostate cancer over the course of almost a year. And so, I guess, tell me why that's not a practice or a pattern. Well, the regional medical directors had to be sure that he was told of treatment options and that information was not before them immediately. That was not entirely due to them. So that did account for some sporadic delay. But my point being is Mr. O'Hannan cannot show that this is a widespread policy that applies across the board. Across the board, meaning more than one individual? Yes. How is he to do that if the people there at the penitentiary were not going to give him any information for his doctor? Well, hang on a second. He did not submit discovery, and he could have submitted broad-based discovery, but he did not. Now, the thing to remember is Mr. O'Hannan, he had other remedies. Well, he did make a request, and it was denied. He made a request, and it was denied by the hospital. You say we don't know that. We do know that he made a request, and it was denied because they said they couldn't give it to him for confidentiality reasons. He could have submitted broad-based discovery, asking for information in a general way without asking for a specific inmate's reference. He had remedies in state court. He could have moved and filed non-constitutional claims in state court where he would have potentially had responding odds superior. One other point I'd like to make is that the import of Mr. O'Hannan's argument has reached far beyond. In this case, Mr. O'Hannan is saying that Verizon should not be shielded from responding odds superior. That is a requirement under Medill. Mr. O'Hannan is asking you to dispense with that requirement. He's asking you to dispense with causation under 1983. He wants you to rewrite 1983, dispense with that requirement, essentially make 1983 a strict liability statute. He's saying as if there's a corporate provider of health care, interestingly, there is liability. There is issue versus Menil. There's no Ninth Circuit case holding that private corporations acting on behalf of a state are subject to Menil. Well, I think the cell case clearly says that. I'm sorry? Cell. Cell, yeah. It says we see no reason in underlying Menil to distinguish between municipalities and private entities acting under colored state law. You'll see that under Menil, it goes through the history, and it states that in this country prior to the passage of the 1871 Act, private corporations were regarded as persons, and that actually proceeds us to know where municipalities were regarded as persons. In No. 57 of that decision, the Supreme Court addresses how the Sherman Act did implicate vicarious liability and how Congress rejected that amendment to the Act. So the law, on the bottom line, is responding as appearing or does not tie to Menil unless there is a showing of a widespread or permanent policy or an action by a final policymaker. And in this case, we don't have that. We merely have decisions by individuals who are implementing the policy. The policy itself is unconstitutionally confirmed. Thank you. Thank you, counsel. We are about to move on. I'm sorry. So the citation does not mean that this court has to extend Menil liability because to do so would be ignoring the Supreme Court's will decision and this Court's decision in Kramski that there is a distinction between a municipality and a state, and Menil applies to municipalities. So if there's a need to reconcile this with the South decision, then this Court needs to show that South, to the extent it extended Menil liability to a private contractor, that was a private contractor that was working with Clark County, Nevada, and the city of Las Vegas. Also, I wanted to just address a question by Judge Morgria about whether or not there was a process for an expediting request. The answer is yes, there is. Under the Utilization Management System at Horizon and Arizona Department of Correction, a doctor who makes an urgent request, the appointment is supposed to be scheduled and completed within 30 days, versus a routine specialty request, which is 60 days. And the record shows that the doctor repeatedly was writing, urgent, urgent, urgent on these requests, going up to the bureaucracy for the three decision-makers to implement their policy, which we would say the policy is constitutionally infirm on its face, because it's a policy of delay that led to this operation. So I'm going to end it. Thank you, Judge. The cases are going to be submitted for decision.
judges: Fernandez, Thomas, Murguia